This case was, I forgot what calendar it was on, several months ago, but specially set for today. Only one case on this calendar, so we'll hear argument now in the case of Chao, the Secretary of Labor v. Casing, Acting & Security Talent, Incorporated. Defendant's the appellant, right? All right. Go ahead, Mr. Benes. Good afternoon. My name is Jeff Benes, and I'm counsel for the defendant and appellant, CAST. The two primary issues before the Court are, one, was there interstate commerce? Was there a sufficient connection to permit the Department of Labor to exercise jurisdiction over CAST in the first instance? And, two, even assuming that there was, whether CAST violated the Act. As to the jurisdiction issue. Well, why is it a jurisdiction issue? Isn't it just a question of whether the merits? Why is it a jurisdictional issue? It's a jurisdictional issue because if a CAST security guard is not engaging in conduct that's a closely related process or is directly essential. Well, then the Secretary of Labor loses and you win, but why is it just a jurisdictional question? Well, if the Court concluded that there was no jurisdiction, we wouldn't go to the second issue. Well, it doesn't matter, but I don't think it's a jurisdictional question. I think that question is just a merits question of whether it's a cause of action. It's not a jurisdictional question. Okay. Go ahead. I understand that, but I'll address it then in this format. The Department of Labor relies upon the Kirschbaum v. Walling case, United States Supreme Court case, suggesting that that case generally stands for the proposition that security guards are, of course, engaged in closely related processes and acts that are directly essential to jurisdiction when they are providing services for a company that might be engaged in commerce. In that case, however, the petitioners before the Court were owners of a building that housed tenants engaged in clothing manufacturing, engaged in commerce, and the owner of the building provided a whole host of different employees for the benefit of the tenants. The Court acknowledged, even in a situation where the petitioner owns the very asset that is housing businesses in interstate commerce, that the problem is one of drawing the line. This is a case where the line has to be drawn that casts a Southern California business admittedly engaging in no interstate act provides an unarmed security guard company to sit on site somewhere in Southern California while a movie production company does whatever it might. But this case is similar to the case you were just talking about in that the the company for whom cast provides the services distributes goods in interstate commerce. Otherwise, you say it's not in a building that's owned by them. It's on a location that they control. That's correct. That's the distinction. And we point out in our briefs in cases involving purely the function or act of a security guard. But those cases were cases in which there was no production of goods for commerce. Here you have the moving companies producing goods for commerce. And I understand you dispute that, but I don't know why, because it seems to me the stipulated facts specifically say so. And then you have a security guard function, which is necessary for them to be able to produce their goods, or else people are going to come and interfere with their production. So what's the problem? The problem is, first of all, the guard is not doing anything that is at all related to the production of a movie. It's not closely related. They are related to production of the movie. They're standing there to see that the production of the movie is not interfered with and, therefore, can go forward. I don't think that that's always the case. It may not always be the case. It doesn't always have to be the case. It has to be the case once, as I understand it. It has to be one employee who's doing that. But to suggest that they're on site offering guard services, and guard services are something that is either closely related to the production of a movie or is a process that is directly essential, that's the line the Supreme Court talked about at Kirschbaum. And if that line, in this case, is evaporated to take those guards and suggest that they are directly essential to the production of a film, there's never going to be one. Well, if you didn't have the guards, there would be a problem producing the film, no? There's no evidence of that. There's no – there is no – And it's not a – There's no evidence. So these movie companies are paying the guards for no reason? Well, I don't know – there's also no evidence of why they might be paying the guards. These are unarmed guards. Common sensically, there's no question the guards are there to protect equipment, to keep – lay people off the set, things of that nature. But they are not closely related to what the subject of the entity. You know, Mr. Bennett, your argument seems to be that to be closely related has to be like an essential necessity. But I don't think that's the law. I mean, it makes a contribution any more than the night watchman, right? I think, Your Honor, that – Or the janitor. Well, in Kirschbaum, the Supreme Court relied upon the factual findings of the lower courts that the services provided by electricians and maintenance men and other people directly to the tenants were essential for the operation of the tenants' businesses. That's what the court found. And guards. Weren't there guards in that case? There were a whole – there were a number of people, including some guards. But the court pointed out that the function of the building, the utilities, the power, that's what the key was that was essential. That doesn't exist here. There's no evidence of that. But, Your Honor, the maintenance of a safe, habitable building is indispensable to that activity. And why isn't the same thing true of the maintenance of a location which isn't being trashed? Well, there's nothing being maintained by CAST. CAST has an unarmed security guard, typically one or two people, sitting in a chair with a shirt on. They're not actively providing any services to anybody in the movie production company. They have no involvement, no integration, nothing. And there's no evidence of that. And I agree that this – when you read the cases, there are – when you first read them facially, you could say, oh, well, isn't CAST involved in making the movie? But, of course, it isn't. This is a movie production company where someone's shooting film, actors, and what ultimately goes into interstate commerce, the finished film, that's far downstream to what CAST is doing. Mr. Greenish, you're down to less than three minutes. Do you want to try to hit the point, too, at least lightly? The second point is the question of whether CAST even violated the Act. And this is keyed by the Department of Labor's contention that the agreements that CAST entered into with all of its guards and the methodology that it used to calculate the wages didn't provide an overtime component. The stipulated fact is that the agreement was signed by all the employees. Okay. But is it not true, when I'm looking at S.E. 69, that if people worked 12 hours or 24 hours or however many hours they worked, they were still paid at the average rate? So, in other words, they were not – people who worked less than would trigger overtime were still paid at the $9 or $10 rate and not at the rate that was recorded as the regular rate. Is that right? The – well, the answer to that is virtually all employees always worked over eight hours. That is why the pay rate schedule was prepared. That's the nature of the – But they did work over 40 hours a week. I'm sorry? They did not work over 40 hours a week. Many of them did not. No, that's not the case. Many of them did not work over 40 hours a week. A guard – the movie business works on a $12 a day. I'm looking at a chart in S.E. 69, and it shows April 12th through April 18th, 1998, hours worked. 24, 12, 20, 12, 12, 20, 13. That is correct, that employees who might have been on job, on site, for a one- or two-day shoot, didn't work 40 hours, would be paid the average rate of pay. That employee who signed his agreement. That is correct. Okay. That's what I was asking. That's correct. But every employee signed the pay rate schedule, which on its face was precise in indicating what the rates were, and specifically indicating that the rate in excess of 40 hours was an overtime rate. And the evidence is quite – But they were, in fact, paid that amount for not-overtime work. An average rate of pay would you say, yes? Yes, right. So isn't that the answer to the problem? Pardon? Whatever it might have said in this piece of paper, in fact, they were paid the average rate of pay for time that was not overtime pay, work. But if they worked more than 40 hours, they signed that the agreement was precise that overtime pay would be paid. But if they worked less than 40 hours, they were not paid at the lower rate. They were paid at the average rate. At average rate. That is correct. And that methodology was used by CAST because of the way that it bid jobs with production companies, where they would just be given some sum of money that they would work backward from. And to make it easy to do wages on an administrative basis, and they had an outside service preparing the paychecks, they used this methodology using an average rate of pay. And, again, that was because so many employees would work more than eight hours and work more than 40 hours. But if they worked less than eight hours, they would still be paid. They would still get an average rate of pay. So doesn't that just disprove your whole case? The contract set forth the overtime pay. But it wasn't really overtime because they were getting it averaged out even if they didn't work overtime. But parties agreed, Your Honor, to that format of pay. And if pay, if hours were worked in excess of 40 hours, overtime pay was conceded and agreed upon in this format. So CAST and the employee determined what was or was not the regular and overtime pay rate. But don't argue to say that the question isn't how you work things back hypothetically but what you're actually paid. That's correct. All right. And they were actually paid an average hourly rate even if they didn't work overtime. That's correct. All right. You can see over your time, Mr. Bernice, but we'll give you a minute for a bubble, all right? Thank you. All right. Let's hear from the plaintiff and the appellant, all right? Good afternoon. My name is Anne Payne Fugate. I represent the Secretary of Labor. I want to first say that there is evidence in the record to support the fact that there is a direct relationship between the activities of these security guards and the production of the films at these public sites. In the excerpts of record of the appellant, the stipulation that was entered into by the secretary and the defendant says at the – Which one are you referring to, the first or second? It's at page 176 of the appellant's excerpts of record. It is, I believe, the second set of stipulated facts. I think it's the first. 176. All right. Thank you. It is the first. In paragraph 11, among the purposes of such security services is to dissuade such persons from interfering with the safe, efficient, and successful filming of the actors and scenes intended to be in the movie, in accordance with the intent of the movie production firm. Further on in paragraph 12, among the purposes of the security services is reducing opportunities for persons to skipping down to paragraph 21 on the next page and paragraph 22. Without such security services, filming activity in public places would be more difficult and time-consuming. Paragraph 22. Without such security services, it would become uneconomic in many instances to engage in filming activities in public places. I think, Your Honor, the court should recognize that the evidence does show, as stipulated, that there's a direct relationship between the guards' work at these production sites and the production of the movies. With respect to the overtime violations, if I can move on, if there are no questions on the coverage issue, I would like to say that first, did not pay for hours over 40 in a work week at one-and-a-half times the regular rate of pay. It was stipulated that the gross, the total gross pay weekly for these employees was always computed, was always computed by multiplying the average rate of pay, which was so-called average rate of pay on these agreements, in these agreements, times the number of hours worked by these employees. The rates that were listed. But does it make a difference, you know, how that how that average hourly rate has arrived at? Your Honor, it does. If you go through the process of having a regular rate and a premium rate and so forth, and then you come up to the average rate, no? No, it doesn't, Your Honor. In this case. Is it possible at all to, without, you know, talking about the tricky facts of the situation, first, I mean, hypothetically, to have some kind of agreement between an employer and the employees as to, you know, ahead of time as to how to pay without, you know, similar to this here? Yes, Your Honor. There there is always an opportunity for the employer and the employees to agree to what the regular rate will be. That regular rate must be, in fact, the bona fide rate at which these workers are paid. And in this case, what was denoted as the regular rate and the overtime rate on these agreements were fiction. This is made evident from the facts that when a guard worked only one day during a work week, and that day was eight hours long, he was not paid the chart's regular rate for eight hours. He was paid the average rate of pay. When an employee only worked one day of 10 hours or 11 hours, he was not paid eight hours at the regular rate as denoted in the contract, and then paid the overtime rate for the additional. Well, that you can't tell, I mean, except it's a record-keeping matter. But then we're just into how they keep the records. But the other point, i.e., what happens if they work less than eight hours or less? If they work less than eight hours. But if they work 11 hours, then it's just an accounting thing, right? Well, I'm talking about if it's just one day in the week of 11 hours. Yes, but under the statute, they would be entitled to pay a premium rate for the hours over eight and not count it toward the regular rate, right? No. The requirement of the FLSA is that you pay overtime based on a 40-hour work week. I understand that. But it's also true that in calculating the regular rate, if they had a rate for any number of hours over eight, that would not count for the regular rate. The statute says that specifically. No, it would not. Right. So, therefore, what you've just said doesn't really prove it up. But the under eight hours proves it up. And also, is there anything in the record about what happens if somebody worked over 45 hours a week? Pardon? If they worked over the 45 hours, are they then paid at the overtime rate or still at the average rate? No, they were always paid the average rate. But are there any instances of that in the record, of people working over the 12-hour day? In other words, working more than 12 hours a day? Yes. There were lots of instances of that. And they're still just paid the average rate. And they were still paid the average rate for hours under 40 and over 40. I guess what I think is the case is simpler than you made it out to be, because you spent time looking at how they did their record keeping, which really doesn't matter that much. What matters is what people were actually paid on the ground. You're correct, Your Honor. So it wasn't presented as well as it could be is what I'm saying. I see. If there are no further questions from the panel, I would ask that the court would affirm the district court's decision. Okay. Thank you, Ms. Susan. Thank you. Mr. Bernays? I don't think the existence of the written pay rate schedule agreement can be overlooked. This is what the parties negotiated and agreed upon. It was not a fiction. It was a fiction if it wasn't what people were paid. Then it's a fiction. But people were paid the exact amount as pursuant to the schedule. No one contested or ever raised an issue that they were mispaid by CAS. Well, whether they raised it or not, the fact is that people who worked more overtime than was calculated into the system were not paid at the overtime rate, right? They were paid based on an average rate of pay. Right. So it's a fiction because they were not, in fact, paid at the overtime rate for overtime. But they were paid pursuant to the written agreements. That's the point I'm trying to make. And there's no evidence that they weren't. There's no evidence that this document was a fiction. But there's no legal rule that you can do that. You can have an agreement, but the agreement has to be an agreement that provides for overtime that's really overtime. That is what the agreement did provide for. All right. Thank you. Thank you, Mr. Bernice. Thank you, Mr. Fugate. This case is now then submitted for decision. We'll stand in recess. Thank you.
judges: Tashima, Berzon, Clifton